**David T. McMILLAN, Plaintiff,**

v.

**TUG JANE A. BOUCHARD Official # 56872, her engines, tackle, appurtenances, bunkers, stores, etc., In Rem B. No. 135 Corporation and Bouchard Transportation Co., Inc., Defendants.**

Civ. A. No. CV–92–4485 (DGT).

United States District Court,
E.D. New York.

May 9, 1995.

Jacob Shisha, Tabak And Mellusi, New York City, for plaintiff.

John J. Walsh, Freehill, Hogan & Mahar, New York City, for defendants.

## *MEMORANDUM AND ORDER*

TRAGER, District Judge:

This is a seaman's action for maintenance and cure. Plaintiff, David T. McMillan, a former seaman and deckhand on the tug Jane A. Bouchard, claims to have injured his back while he attempted to lift a shackle and line on the tug. As a result of this injury McMillan alleges that he was rendered unfit for duty and, therefore, entitled to past, present and future maintenance and cure. McMillan also claims that despite his repeated requests, defendant, Bouchard Transportation Co. (Bouchard), "wilfully, wantonly and callously refused to pay [his] maintenance and cure." For this, McMillan seeks punitive damages in the amount of $400,000 along with attorneys' fees.

Defendant Bouchard asserts that the accident was the result of a pre-existing back injury, which McMillan knowingly and fraudulently failed to disclose prior to being hired as deckhand on the tug. In addition, Bouchard argues that McMillan also fraudulently withheld that he had a history of Valium use to control muscle spasms and discomfort throughout his body, including his back. Accordingly, Bouchard argues that McMillan was not entitled to maintenance and cure. Alternatively, Bouchard argues that McMillan had reached maximum medical cure on May 18, 1992, and was not entitled to payments for maintenance and cure beyond that date.

Bouchard also claims that it did not wantonly and callously refuse to pay McMillan's maintenance and cure, and, accordingly, punitive damages are not warranted. Further, Bouchard also contends that in this Circuit punitive damages are limited to attorneys' fees only.

1. The dates for McMillan's prior work are approximate and are derived from his deposition

### Facts

Prior to being employed by Bouchard, McMillan had a varied work history. Following the eleventh grade, in 1975 McMillan worked in a commissary and as a carpenter (Tr. 193–94). *See also* McMillan Dep. at 33–34, 79–80.[1] Between 1976–77 McMillan worked in commercial construction and for Newport News Shipbuilding & Drydock. *See* McMillan Dep. at 81–83. McMillan quit his construction job because he was required to work too much overtime and had an unspecified disagreement with his supervisor (Tr. 194, 244). In 1977–78, McMillan worked for a home improvement company, Hatchett Home Improvement, but quit again because of an unspecified disagreement with his supervisor (Tr. 245). *See also* McMillan Dep. at 83–84. For the following three years—1978–81—McMillan worked as deckhand for a commercial fishing company out of Newport News, Virginia. *Id.* at 85–87. Thereafter, for about two years McMillan was a self-employed carpenter and also worked for a small house framing company. *See* McMillan Dep. at 89–91. For the next four years McMillan worked as a deckhand for three different tugboat companies—SeaTow, Inc., M & W Marine, and Lockwood (Tr. 236, 245–47). *See also* McMillan Dep. at 92–98. At trial, McMillan also testified that he quit two of these jobs because of disagreements with management and dissatisfaction with his working conditions (Tr. 245–47).

McMillan's health history is as varied as his work history. In 1976, McMillan pulled a muscle in his upper back while moving a material box for Newport News Shipbuilding & Drydock (Tr. 195). McMillan missed five days of work because of this injury (Tr. 195). In 1982, McMillan was involved in a car accident, the result of which left him with a concussion and required him to undergo orthodontic procedures (Tr. 234). McMillan was involved in two other car accidents in 1985 and 1987, both of which left him with neck and shoulder injuries (Tr. 195). However, McMillan testified that he missed no work because of these injuries (Tr. 196–97).

and trial testimony.

McMillan also testified that although he suffered a sprained ankle in May of 1990 while working for one of the tug companies, he lost only one day of work (Tr. 200). *See also* Def.'s Exh. A.

McMillan also has a history of Valium use to control muscle spasms and cramps (Tr. 198). McMillan was first prescribed Valium by Dr. Louis Parham in November 1985 following the automobile accident in Virginia. *See* Def.'s Exh. E. Dr. Parham's records indicated that McMillan renewed this prescription in December of 1985 and February of 1991 (Tr. 234–37). In addition, according to McMillan's own testimony, the prescription was renewed again in February of 1992, and McMillan continued to take Valium at least through August 1992 (Tr. 237–38).

McMillan started working for Bouchard as a deckhand in September 1991. As a deckhand, McMillan was required primarily to "make up to the barges"—hook up the tug to the barges (Tr. 202). Deckhands also were required, among other things, to keep the decks clean and bring supplies onto the tug (Tr. 202). In performing these tasks, deckhands do a considerable amount of heavy lifting, pulling and climbing (Tr. 120, 202–03). Deckhands normally work what are called "hitches"—a period of days during which the deckhand is on the tug and works six hours, has six hours off, etc. (Tr. 120). A normal hitch lasts 28 days (Tr. 204).

McMillan worked five hitches for a total of 142 1/2 days during the seven month period he was employed by Bouchard. One hitch lasted as long as 50 days—January 23, 1992, through March 12, 1992 (Tr. 273). Immediately following the 50–day hitch, McMillan was scheduled to perform a 14–day hitch leading up to the extended Easter weekend—April 1, 1992, through April 15, 1992 (Tr. 273). During that hitch, McMillan made a number of telephone calls to Christopher Walsh, Bouchard's employee responsible for personnel and operations, in which he inquired about the availability of his replacement and what options he had for getting off the tug (Tr. 274). According to Walsh, Bouchard was having a difficult time finding a deckhand to replace McMillan (Tr. 275). Walsh testified that as the planned end of McMillan's hitch approached he became "more agitated" with Bouchard's inability to find a replacement (Tr. 275). In the final telephone conversation, Walsh claimed that McMillan said something to the effect of "one way or another I am getting off the boat" (Tr. 275–76).

On April 19, 1992, when in transit from Staten Island, New York to Port Jefferson, Long Island, McMillan "heard and felt a pop" in his back while he attempted to lift a heavy shackle and 10–inch cable (Tr. 207). McMillan immediately told the assistant engineer of the injury and also reported it to the mate (Tr. 207–08). When the boat arrived in Port Jefferson, McMillan went to John Mathers Hospital where he was diagnosed with a muscle sprain and was prescribed Motrin and five days of bed rest (Tr. 209). Thereafter, McMillan returned to the tug, which took him back to New York so he could fly home to Florida. During the return trip to New York, McMillan completed an accident report while in the presence of the assistant engineer and mate (Tr. 208–09). McMillan did not resume his position as deckhand during the return trip to New York.

After McMillan returned to his home in Ocala, Florida, his back pain persisted and he contacted Peter Austen, Bouchard's risk manager in New York. Austen agreed to find McMillan a neurosurgeon in Florida to treat his injury. Shortly thereafter, Austen arranged for McMillan to see Dr. Juan Lora, a board eligible neurosurgeon, in Ocala on May 4, 1992 (Tr. 51).[2] When he visited Dr. Lora, McMillan complained of severe back pain which radiated down both of his legs. *See* Def.'s Exh. F. Dr. Lora noted that McMillan stated that he had back pain before the injury on the tug, but complained that "this does not feel like a regular strain." *Id.*

2. A board eligible physician, as opposed to board certified, is eligible to take the examinations to become certified but has not done so. *See* Lora Dep. at 4–5. Defendant decided to send McMillan to a neurosurgeon after having contacted its "P & I Club representative" in Florida (Tr. 50). The decision was based on plaintiff's complaints and the availability of physicians in the area (Tr. 53).

Dr. Lora also noted that McMillan had admitted using Valium "for several years." *Id.* From the initial neurological examination, Dr. Lora determined McMillan's condition to be "essentially within normal limits." *Id.* Dr. Lora found some tenderness in the paravertebral muscles; however, there was no evidence of neurological abnormalities. *Id.* Dr. Lora prescribed a Magnetic Resonance Imaging test (MRI), physical therapy and recommended that McMillan return for a follow up examination in two weeks (Tr. 212). *Id.*

McMillan's MRI was performed on May 12, 1992, and was largely unremarkable. Although there was no evidence of a herniated disc, in the opinion of the radiologist, there was minimal bulging of the L5–S1 disc centrally. *Id.* Following McMillan's initial visit with Dr. Lora, he attended Ocala Physical Therapy for two weeks. On May 18, 1992, McMillan's physical therapist wrote to Dr. Lora and explained that McMillan had progressed about fifty percent, but still had positive straight leg raises in both legs at sixty degrees. In addition, the physical therapist noted that McMillan complained of "an older injury ... when he fell on his cocyx [sic] and that is where he feels the pain originates from." *Id.*

McMillan returned to Dr. Lora on May 18, 1992. At that time Dr. Lora noted that "most of [McMillan's] back pain and leg pain has gone away, however, he continues to complain about coccyx pain." *Id.* While Dr. Lora opined that McMillan's coccyx pain was no reason for him not to return to work, he noted that "Mr. McMillan feels very leery about going to work." *Id.* In addition, Dr. Lora recommended that McMillan see an orthopedic surgeon.[3] However, Dr. Lora also noted that from a neurological perspective McMillan had reached maximum medical cure and could return to work as soon as he was evaluated by the orthopedic surgeon.[4]

After reviewing McMillan's medical reports, the results of his MRI, and discussing the case with Dr. Lora, on May 18, 1992, Austen terminated McMillan's maintenance and cure. McMillan, however, was not notified of the termination until a later time (Tr. 214–17). Bouchard's decision at this point to terminate maintenance and cure payments was based on Dr. Lora's opinion that McMillan had reached maximum medical cure and the radiologist's report which indicated that

---

**3.** At trial, the parties disagreed as to the purpose of Dr. Lora's recommendation that McMillan see an orthopedic surgeon. McMillan claimed the recommendation was for the purpose of determining whether he was fit for duty, and implied that the recommendation undercut Dr. Lora's opinion that McMillan had reached maximum medical cure. *See* Pl.'s Post-trial Mem. at 7. On the other hand, Bouchard claimed that the recommendation related to McMillan's complaint of coccyx pain, not to the injury suffered on the tug, and, therefore, was intended to alleviate McMillan's fears of a serious back injury. *See* Def.'s Post-trial Brief at 6. Bouchard's position is more persuasive.

First, in his deposition Dr. Lora clearly stated that his recommendation was based on McMillan's complaints of coccyx pain, which appeared to be unrelated to his injury on the tug. *See* Lora Dep. at 35. Second, the issues of whether a seaman is fit for duty and whether he or she has reached maximum medical cure are separate and distinct. *See Koslusky v. United States*, 208 F.2d 957, 959 (2d Cir.1953). Payment of maintenance and cure is required until a seaman reaches either, but not both, of these points. As Dr. Lora clearly stated that plaintiff had reached maximum medical cure from a neurologist's perspective on May 18, 1992, Bouchard could at that point terminate McMillan's maintenance

and cure payments and had no need for a determination of whether McMillan was fit for duty. *See, e.g., Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962).

**4.** In his post-trial memorandum, McMillan's counsel argues that: "Doctor Lora admitted in his deposition that had he been told of the extent of physical labor that Mr. McMillan had to perform as a seaman, he would not have found him fit for duty." Pl.'s Post-trial Mem. at 7–8. In so arguing, counsel apparently is trying to infer that Dr. Lora would not have found that McMillan had reached maximum medical cure on May 18, 1992, had he known of the physical requirements of a deckhand. Although on cross-examination Dr. Lora stated that the type of work a person does is relevant to the question of whether he or she has reached maximum medical cure, see Lora Dep. at 32–35, such is not the case. *See generally Koslusky, supra,* 208 F.2d at 958–59 (a finding that seaman is fit for duty does not conclusively establish that he or she has reached maximum medical cure). In fact, on redirect examination, Dr. Lora acknowledged that the type of work a person does is not relevant to the determination of whether he or she has reached maximum medical cure. *See* Lora Dep. at 54–55.

there was no impingement of the nerves in McMillan's back (Tr. 60).[5] Bouchard paid all of McMillan's medical expenses related to the injury, and maintenance at a rate of $15 per day from April 19, 1992, through May 18, 1992 (Tr. 217).

Following the May 18 visit to Dr. Lora, McMillan contacted Peter Austen to determine if Bouchard would pay for an orthopedic examination (Tr. 214). As Dr. Lora indicated that McMillan had reached maximum medical cure, Bouchard chose not to pay for such an examination (Tr. 58–59); however, Austen never responded to McMillan's inquiry (Tr. 214). As McMillan could not afford to pay for the orthopedic examination he decided to seek out chiropractic treatment for his back (Tr. 214–215). McMillan received six chiropractic treatments in the following three weeks (Tr. 215). Dr. Jeffrey G. Pitts, McMillan's chiropractor, diagnosed him with a "[t]horacic lumbar sprain, strain, Lumbar Intervertebral disc ... [and] Lumbago (low back)." Pl.'s Exh. 26. Dr. Pitts noted that McMillan had positive straight leg raises at forty-five degrees right and sixty degrees left, positive lowering of both legs when extended and positive bilateral leg raise. *Id.* Although he had improved slightly throughout the course of the treatment, Dr. Pitts noted that McMillan could not engage in any physical activity without "flair up of [the] original symptoms," and his prognosis remained guarded. *Id.*

On June 11, 1992, McMillan contacted Peter Austen to see if Bouchard would reimburse him for the chiropractic treatments (Tr. 66, 215). Although Austen requested that McMillan submit a chiropractor's report and bills, Austen never responded to McMillan's request (Tr. 68, 215). At trial, Austen testified that Bouchard refused to pay for the chiropractic treatments based on Dr. Lora's opinion that McMillan had reached maximum medical cure (Tr. 67–68).

After being denied reimbursement for his chiropractic treatments, McMillan retained counsel for the purpose of getting his maintenance and cure reinstated (Tr. 217). Shortly thereafter, McMillan was examined by two physicians, both of whom agreed that McMillan had not reached maximum medical cure.

On August 3, 1992, McMillan was evaluated by Dr. Harry Jones, a board certified orthopedic surgeon. *See* Pl's Exh. 24. At that time, McMillan complained of pain in the lumbar spine which did not radiate to his legs, and coccyx pain. Dr. Jones noted, among other things, that there was:

> tenderness from L5–S1 and at the coccyx. Motions of the spine are limited –1 in flexion, extension, right and left lateral bending. There is a grade I muscle spasm present in the paralumbar musculature. Straight leg raising test is –90 on the right and –90 on the left.

*Id.* Dr. Jones' impression was "a lumbosacral sprain, and ... a bulging disc L5–S1, as per the MRI report." [6] In addition, Dr. Jones stated "[McMillan] is not able to work at the job that he has held"—he was not fit for duty. *Id.* McMillan continued to see Dr. Jones through April 1, 1993. During this period, and although McMillan's condition showed improvement at times, Dr. Jones opined that McMillan was "temporarily totally disabled." *Id.* Further, on at least two occasions, Dr. Jones noted that physical therapy was necessary to rehabilitate McMillan's low back, and throughout his treatment noted that medication was needed to alleviate his pain. *Id.* Finally, after reviewing McMillan's MRI films, Dr. Jones noted that McMillan had a *"protruded* disc at L5–S1." *Id.* (emphasis added).

On May 12, 1993, McMillan was evaluated by Dr. Howard D. Balensweig, a board certified orthopedic surgeon.[7] At that time, Dr.

---

5. Bouchard did not become aware of McMillan's prior back injuries and Valium use until after McMillan requested that his maintenance and cure payments be reinstated (Tr. 111). *See also* discussion *infra* p. 30.

6. *See* Jones Dep. at 9. It is important to note that although Dr. Jones initially stated that McMillan had a bulging disc, he based this as-

sessment only on the MRI *report,* not the films themselves. At that time, he noted that "I will need to see the films." *See* Pl.'s Exh. 24.

7. *See* Pl.'s Exh. 20. Dr. Balensweig's report was admitted into evidence for the limited purpose of showing that Bouchard had notice of Dr. Balensweig's opinion that McMillan had not reached

Balensweig opined that McMillan had not reached maximum medical cure. *See* Pl.'s Exh. 20 at 7. Dr. Balensweig recommended that McMillan receive "active care" starting with further investigation—another MRI, a discogram and possibly a prenyl jacket to immobilize his back. *Id.*

Based on these evaluations, McMillan's counsel sent numerous letters to Bouchard requesting that McMillan's maintenance and cure be reinstated (Tr. 17–20). In each letter McMillan's counsel stressed that the physicians agreed that McMillan was not fit for duty and had not reached maximum medical cure. However, Bouchard refused to reinstate McMillan's maintenance and cure. At trial, Austen testified that Bouchard's decision not to reinstate maintenance and cure payments was based on McMillan's previously undisclosed prior back injuries and Valium use, as well as Dr. Lora's original opinion that McMillan had reached maximum medical cure (Tr. 84, 98, 100–01, 111).

## Discussion

This case raises four issues for resolution. First, whether the concealment of his pre-existing back injury and Valium use precludes McMillan from receiving an award of maintenance and cure. Second, whether McMillan reached maximum medical cure, and if so, when. Third, if McMillan is entitled to maintenance and cure, what is the amount to which he is entitled. And, fourth, whether Bouchard callously or recalcitrantly failed to reinstate McMillan's maintenance and cure, and, if so, whether McMillan is entitled to punitive damages in excess of his attorneys' fees.

### Maintenance and Cure—Generally

"The law of maintenance and cure is of ancient origin," dating back to at least the twelfth century. *Ritchie v. Grimm*, 724 F.Supp. 59, 61 (E.D.N.Y.1989) (*citing McWil-*

*liams v. Texaco, Inc.*, 781 F.2d 514, 517 n. 7 (5th Cir.1986)). According to the law, a shipowner is responsible for paying maintenance and cure following any injury or sickness incurred by a seaman while in the shipowner's employ. *See Rodriguez Alvarez v. Bahama Cruise Line, Inc.*, 898 F.2d 312, 314–15 (2d Cir.1990). *See also Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527–28, 58 S.Ct. 651, 652–53, 82 L.Ed. 993 (1938). The cause of the injury or sickness is irrelevant, and tort law rules of contributory negligence, comparative fault, assumption of risk and unseaworthiness do not apply.[8]

"Maintenance" is the sum of money sufficient to provide food and lodging for the injured seaman during his or her convalescence and until he or she reaches the point of maximum medical cure. *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962).[9] "Maximum medical cure" is reached when the seaman recovers from the injury, the condition permanently stabilizes or cannot be improved further. *See, e.g., Vella v. Ford Motor Co.*, 421 U.S. 1, 5, 95 S.Ct. 1381, 1383, 43 L.Ed.2d 682 (1975); *Berke v. Lehigh Marine Disposal Corp.*, 435 F.2d 1073, 1076 n. 3 (2d Cir.1970), *cert. denied*, 404 U.S. 825, 92 S.Ct. 55, 30 L.Ed.2d 53 (1971). "Cure" consists of payments for all aspects of the seaman's medical care until he or she reaches maximum medical cure. *Calmar, supra*, 303 U.S. at 528, 58 S.Ct. at 653. It is the seaman's burden to prove his or her right to maintenance and cure, *Carlsson v. United States*, 252 F.2d 352, 353 (2d Cir. 1958); *Gillikin v. United States*, 764 F.Supp. 261, 267 (E.D.N.Y.1991), but it is the shipowner's burden to prove that the seaman has reached a point of maximum medical cure. *See generally Sammon v. Central Gulf Steamship Corp.*, 442 F.2d 1028, 1029 (2d Cir.), *cert. denied*, 404 U.S. 881, 92 S.Ct. 202,

---

maximum medical cure as late as May 12, 1993 (Tr. 96).

**8.** *See, e.g., Aguilar v. Standard Oil Co.*, 318 U.S. 724, 731, 63 S.Ct. 930, 934, 87 L.Ed. 1107 (1943). However, gross and willful misconduct on the part of the seaman is sufficient to preclude him or her from receiving maintenance and cure. *See Warren v. United States*, 340 U.S. 523, 528, 71 S.Ct. 432, 435, 95 L.Ed. 503 (1951).

**9.** In addition to maintenance, an injured seaman is entitled to receive unearned wages until the scheduled end of his or her voyage or term of employment. *See McManus v. Marine Transp. Lines, Inc.*, 149 F.2d 969 (2d Cir.), *cert. denied*, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945). McMillan, however, does not seek to recover any unearned wages.

30 L.Ed.2d 162 (1971). Any doubts or ambiguities relating to maintenance and cure must be resolved in favor of the seaman. *See Vaughan, supra,* 369 U.S. at 531–32, 82 S.Ct. at 999–1000; *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 735–36, 63 S.Ct. 930, 936, 87 L.Ed. 1107 (1943).

## McMillan's Concealment of Pre-existing Medical Conditions

Generally, there are two rules of law applicable to the issue of concealment of a pre-existing medical condition in maintenance and cure cases. One rule states that if a "seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure" only if the claimed injury is *causally linked* to the concealed medical condition. *McCorpen v. Central Gulf S.S. Corp.,* 396 F.2d 547, 549 (5th Cir.), *cert. denied,* 393 U.S. 894, 89 S.Ct. 223, 21 L.Ed.2d 175 (1968). Rules similar to the *McCorpen* standard have been adopted by a majority of the Circuit Courts of Appeals.[10]

■ The Second Circuit, however, follows a different rule. In *Sammon, supra,* the Court of Appeals announced that "the rule in the *McCorpen* case ... is not the rule of this Circuit." *Id.* at 1029. Under *Sammon,* a seaman may be denied maintenance and cure for having concealed a pre-existing medical condition only if he *knew or reasonably should have known* that the condition was *relevant* to his employment. *Id.* at 1029. Under this standard, no showing of a causal connection between the prior and current injuries or conditions need be made. Accordingly, as the plaintiff in *Sammon* had a good faith belief that his pre-existing condition was not relevant to his position, the award for maintenance and cure was allowed. *Id.* at 1028. *See also Ahmed v. United States,* 177 F.2d 898, 900 (2d Cir.1949) (seaman "who believes himself fit for duty and signs on without any fraudulent concealment,

is entitled to maintenance and cure, notwithstanding a previous condition of ill health").

At trial, Bouchard attempted to prove that McMillan knew, or reasonably should have known, that his prior condition was relevant. Bouchard offered McMillan's three employment applications for the position as deckhand as evidence that he knowingly failed to disclose the prior conditions. *See* Def.'s Exhs. A, B, D. Bouchard's standard employment application lists a number of questions concerning an applicant's medical history; for example, "3. Have you ever had an 'on the job' injury in which you lost time from work?", and "8. Have you been taking any medication in the past year." *Id.* The only injury or condition which McMillan listed on any of the applications was the sprained ankle he suffered in 1989. It was conceded that McMillan failed to list his prior back injuries and Valium use on any of the applications. Further, Austen and Walsh both testified that Bouchard probably would not have hired McMillan had it known about the prior back injuries and Valium use—the conditions were relevant to McMillan's employment (Tr. 111–12, 272–73).

■ Applying the law of the Second Circuit to the facts of this case, McMillan's claim for maintenance and cure cannot be precluded by his failure to disclose his prior back injuries and Valium use as he had a good faith basis for not disclosing either condition in his pre-employment applications. McMillan testified that the two prior injuries both were to his neck and shoulder area, and only resulted in him missing a total of five days of work in 1976 for Newport News Shipbuilding & Drydock (Tr. 195–97). In addition, prior to being employed by Bouchard, McMillan had been employed as a deckhand with three different tug companies without adverse consequences or problems because of the injuries (Tr. 236, 245–47). Further, McMillan's Valium use does not appear to have been consistent, and stemmed from cramps and muscle spasms, not from the prior back injuries. In addition, the Valium use had not

---

**10.** *See Wactor v. Spartan Trans. Corp.,* 27 F.3d 347, 352 (8th Cir.1994); *Evans v. Blidberg Rothchild Co.,* 382 F.2d 637, 639 (4th Cir.1967); *Burkert v. Weyerhaeuser Steamship Co.,* 350 F.2d 826, 829 n. 4 (9th Cir.1965); *Sulentich v. Interlake Steamship Co.,* 257 F.2d 316, 320 (7th Cir.), *cert. denied,* 358 U.S. 885, 79 S.Ct. 125, 3 L.Ed.2d 113 (1958); *Lipscomb v. Groves, et al.,* 187 F.2d 40, 45 (3d Cir.1951).

prevented him from performing his duties as a deckhand. Simply put, McMillan had a good faith basis for believing that neither condition was relevant to his employment with Bouchard as the conditions had not prevented him from working successfully as a deckhand, or in any other capacity, in the past. Moreover, even if McMillan was mistaken about the relevance of these conditions to his position with Bouchard, his claim for maintenance and cure should be sustained as an honest failure to reveal a prior medical condition cannot defeat a claim for maintenance and cure. *See, e.g., Ahmed, supra,* 177 F.2d at 900 (an honest failure to disclose a prior condition, even if relevant, will not defeat claim for maintenance and cure); *Mort v. Weyerhaeuser Company, SS C.R. Musser,* 294 F.Supp. 936, 938 (S.D.N.Y.1968) (same).[11]

**Maximum Medical Cure**

As stated previously, it is the shipowner's burden to provide an injured seaman with maintenance and cure until he or she reaches maximum medical cure—when the seaman recovers from the injury or the condition permanently stabilizes and cannot be improved further. *See, e.g., Vella, supra,* 421 U.S. at 5, 95 S.Ct. at 1383; *Vaughan, supra,* 369 U.S. at 531, 82 S.Ct. at 999. Although this seems a rather straight forward concept, its application is not so simple.

For example, in *Farrell v. United States,* 167 F.2d 781 (2d Cir.1948), *aff'd,* 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949), the Court of Appeals affirmed the district court's refusal to allow payments for future maintenance and cure although "appellant [would] from time to time require some medical care to alleviate his [symptoms] which may indeed become worse in the future." *Id.* at 785. Similarly, in *Muruaga v. United States,* the Court of Appeals reversed a judgment for maintenance and cure to a victim of an incurable cardiovascular disease noting that "when maintenance and cure has brought about all the improvement to be expected in an incura-

ble disease the shipowner's liability ends . . . [i]f the seaman thereafter needs attention to maintain his improvement at the maximum, to assist him in recovery from relapses, or to restrain the progress of the disease, the shipowner is not bound to provide that." *Muruaga,* 172 F.2d 318, 321 (2d Cir.1949).

In cases such as this, the vexing question is when did the seaman's condition become such that it improved to the maximum or had become incurable? The rule of law which must be applied in this Circuit dictates that as long as the seaman's condition is susceptible to curative as opposed to palliative treatment, the shipowner is liable for maintenance and cure. *See Berke, supra,* 435 F.2d at 1076; *Desmond v. United States,* 217 F.2d 948, 950 (2d Cir.1954), *cert. denied,* 349 U.S. 911, 75 S.Ct. 600, 99 L.Ed. 1246 (1955). *See also Vella, supra,* 421 U.S. at 5–6, n. 4, 95 S.Ct. at 1383–84, n. 4. As explained below, although Bouchard had a good faith basis for terminating McMillan's maintenance and cure on May 18, 1992, and not reinstating it thereafter, its determination was in error. The evidence at trial indicates that while McMillan's medical condition had improved as of the date Bouchard terminated his maintenance and cure, it had not stabilized or improved to the maximum and was still susceptible to curative treatment.

As stated earlier, Dr. Lora opined that McMillan had reached maximum medical cure from a neurological perspective on May 18, 1992, which was only one month after McMillan's injury on the tug. Dr. Lora's opinion was based on his May 4, 1992, examination of McMillan, the MRI report, and McMillan's complaints of continued coccyx pain. Dr. Lora reached this opinion with full knowledge of the physical therapist's report which indicated that McMillan had progressed only fifty percent and still had positive straight leg raises. Dr. Lora's opinion as a neurologist, however, is contradicted by the subsequent medical evidence as well as his

---

**11.** Although McMillan's statement to Walsh that "one way or another I am getting off the boat" is troubling, and, at first glance may have indicated that McMillan concocted his injury and complaints of disabling back pain for this litigation, his complaints are supported by the medical evi-

dence presented at trial and, in any event, it would be reaching to conclude from such a statement that some months earlier he had fraudulently concealed his pre-existing medical conditions.

own deposition testimony of October 24, 1994, where he stated that McMillan's continued complaints might have indicated that his pain was not neurological-based. Moreover, Dr. Lora's opinion as to McMillan's condition from a neurological perspective as of May 18, 1992, is not determinative of whether McMillan had reached maximum medical cure with respect to other aspects of his injury.

During his deposition, Dr. Lora indicated that it usually takes at least two months for a back strain—McMillan's diagnosis according to Lora—to resolve.[12] Dr. Lora did not, however, indicate whether this estimate was from a neurological perspective or otherwise. In any case, at the time Lora opined that McMillan had reached maximum medical cure only one month had passed since the injury, which, even according to Dr. Lora's diagnosis and estimate for recovery, was not enough time for McMillan's condition to have "resolved" itself neurologically or otherwise. Moreover, Dr. Lora admitted that if, after six months of treatment, McMillan still experienced pain and was not fit for duty, this would indicate that "something was wrong ... [e]ither the treatment [was] not appropriate [or] it could be something else besides the back." Lora Dep. at 45. In other words, his condition would not have stabilized, or improved to the point where no treatment could benefit him—he would not have reached maximum medical cure by that time. As it turned out, such was the case.

Dr. Maurice Carter, Bouchard's expert and a board certified orthopedic surgeon, examined McMillan for the purposes of this litigation on November 17, 1993 (Tr. 138). At that time, Dr. Carter found no signs of neurological impairment and was unable to make a diagnosis of lumbar radiculopathy (Tr. 142–51). Dr. Carter noted that there was "no provable residual of whatever happened to him on April 19, 1992" (Tr. 153). Accordingly, Dr. Carter opined that McMillan had reached maximum medical cure as of that date. However, Dr. Carter was unable to give a definitive opinion as to whether McMillan had reached maximum medical cure prior to November 17, 1993.

With respect to McMillan's condition prior to November 1993, Dr. Carter admitted that Dr. Jones was in a better position to determine whether or not McMillan had reached maximum medical cure than he or Dr. Lora (Tr. 171, 174). Specifically, Dr. Carter noted that MRI's are subject to different interpretations by different experts and that a patient's condition may change over time (Tr. 166). Further, Dr. Carter indicated that a physician who reads the MRI *film* and treats the patient over a longer period of time—Dr. Jones—is in a better position to make a determination as to when that patient reaches maximum medical cure than a physician who reads the MRI *report* and examines the patient only once—Dr. Lora—(Tr. 166). In fact, and although Dr. Carter did not agree with Dr. Jones' opinion as to what was causing McMillan's back pain, he supported Dr. Jones diagnosis that the disc in question was protruded (Tr. 182). Moreover, Dr. Carter indicated that on May 18, 1992, after Dr. Lora received the physical therapist's report which indicated McMillan only improved fifty percent during the prior two weeks, he should have completed another physical examination of McMillan before he determined that McMillan had reached maximum medical cure (Tr. 184–85). Similarly, Dr. Jones stated that it would not have been possible for Dr. Lora to make the determination of maximum medical cure without examining McMillan on May 18, 1992. *See* Jones Dep. at 25–26.

Although Dr. Jones was in a better position to make the proper determination as to maximum medical cure, McMillan ceased his treatment in April 1993. At that time, Dr. Jones noted that McMillan had a protruded disc at L5–S1, a grade II muscle spasm, limited range of motion, positive straight leg raise in the right leg, and continued low back and right leg pain. Further, although Dr. Jones' medical report did not indicate whether or not McMillan had reached maximum medical cure as of April 1993, he clearly

---

12. Dr. Lora noted that the time for a back strain to resolve varies from person to person and is based on a number of factors—age, weight, athletic condition, etc. Dr. Lora noted that it would take an athletic person around two months to recover from such a strain. *See* Lora Dep. at 26–27.

stated in his deposition that he could not make such a determination "with a reasonable degree of medical certainty" based on the fact that McMillan had ceased his treatment at that time. *See* Jones Dep. at 18–19. However, Dr. Jones did opine that McMillan was not fit for duty at that point, and noted that, had McMillan continued with treatment, he would have ordered another MRI and done further examinations to see if the disc problem had gotten better or worse. *See id.* These statements clearly indicated that McMillan had not reached maximum medical cure by April 1993.

 Unfortunately, as there was no medical evidence presented at trial for the intervening months of April to November 1993, it is extremely difficult to determine exactly if and when McMillan reached maximum medical cure. However, based on the fact that in April 1993 Dr. Jones determined that McMillan still suffered from the lumbar strain and radiculopathy related to his injury on the tug and was not fit for duty, and that on November 17, 1993, Dr. Carter determined that McMillan had "no provable residual of whatever may have happened to him on April 19, 1992" (Tr. 153), it is appropriate to resolve any doubts in McMillan's favor and conclude that he reached maximum medical cure on November 17, 1993. *See Vaughan, supra,* 369 U.S. at 531–32, 82 S.Ct. at 999–1000 (any doubts relative to maintenance and cure must be resolved in favor of the seaman). McMillan, therefore, is entitled to payments for maintenance and cure through that date.

## Amount of Maintenance and Cure

The law on the proper amount which a shipowner must pay for maintenance is "anything but crystal clear." *Ritchie, supra,* 724 F.Supp. at 61. Although the "ancient law" refers to an amount the seaman "had on shipboard in his health", *McWilliams, supra,* 781 F.2d at 517 n. 7 (*citing* Article VII of the Laws of Oleron), it is unclear exactly .what that statement entails, and courts have not limited themselves to such an accounting. Some courts have awarded a customary amount, which had been established in prior cases or stated in a collective bargaining agreement. *See, e.g., Gardiner v. Sea–Land*

*Service, Inc.,* 786 F.2d 943, 948–50 (9th Cir.) (maintenance amount in collective bargaining agreement is conclusive unless seaman can show that the agreement as a whole was unfair, or the rate was no more than a token and union received no quid pro quo for surrendering the right), *cert. denied,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986). Other courts have awarded higher rates based on a seaman's actual living expenses. *See Incandela v. American Dredging Co.,* 659 F.2d 11, 14 (2d Cir.1981). The Second Circuit follows the latter approach. *Id.*

 In *Incandela,* the Second Circuit adopted an approach wherein the amount of maintenance is determined after giving consideration to plaintiff's prima facie showing of his or her actual living expenses and defendant's evidence in rebuttal showing feasible alternatives in the same community. *Id.* While the burden on the seaman is "feather light", he or she must provide the court with an evidentiary basis on which an amount may be based. *See Gillikin, supra,* 764 F.Supp. at 267 (*citing Yelverton v. Mobile Laboratories, Inc.,* 782 F.2d 555, 558 (5th Cir.1986)). "So light is this burden that it may be satisfied by the seaman's own testimony concerning his actual expenditures or concerning the reasonable cost of food and lodging in his area." *Id.* On the other hand, evidence offered by the shipowner on the amount routinely paid to other seaman for food and lodging or the reasonable cost of these expenses in the community where the seaman lived have been found sufficient to support an award of a particular amount. *See Harper v. Zapata Off-Shore Co.,* 741 F.2d 87, 91 (5th Cir.1984).

 Here, on direct examination McMillan testified that his actual living expenses during the period of his convalescence were $40 per day, including $10–12 per day for food (Tr. 230–32). On cross-examination, however, Bouchard's counsel elicited testimony which showed, except for a one-month period, McMillan actually lived rent-free with friends and family from June 1992 through the trial (Tr. 226, 249–51). *See also* McMillan Dep. at 18–26. Based on this testimony, a reasonable amount for maintenance would appear to be $15 per day to cover McMillan's

costs for food as a seaman normally is not entitled to recover the cost of lodging during any period he or she lived rent-free with family or friends. *See Johnson v. United States,* 333 U.S. 46, 50, 68 S.Ct. 391, 393, 92 L.Ed. 468 (1948).[13] However, as McMillan was forced to live with family and friends because of the economic necessity created by Bouchard's termination and refusal to reinstate his maintenance and cure, a more appropriate amount of maintenance would be the $40 per day demanded in the complaint.

Although neither the Supreme Court nor the Second Circuit has addressed the exact issue of whether a shipowner can decrease its liability for maintenance when a seaman is forced to live with family or friends at no cost to himself following the shipowner's refusal to pay maintenance, it has addressed a sufficiently analogous situation—the ability of a shipowner to offset maintenance by the amount of a seaman's wages from other employment during his or her convalescence which was made necessary by the shipowner's refusal to pay maintenance. *See Vaughan, supra,* 369 U.S. at 533–34, 82 S.Ct. at 1001. In *Vaughan,* where a shipowner withheld maintenance and cure for two years and the disabled seaman was forced to work in order to survive, the Court held that the shipowner could not offset the maintenance owed to the seaman by the wages he earned as a taxi driver during his convalescence. *Id.* As the Court stated:

It would be a sorry day for seamen if shipowners, knowing of the claim for main-

tenance and cure, could disregard it, force the disabled seaman to work, and then evade part or all of their legal obligation by having it reduced by the amount of the sick man's earnings. This would be a dreadful weapon in the hands of unconscionable employers and a plain inducement ... to use the withholding of maintenance and cure as a means of forcing sick seamen to go to work when they should be resting, and to make the seamen themselves pay in whole or in part the amounts owing as maintenance and cure. *This result is at war with the liberal attitude that heretofore has obtained and with admiralty's tender regard for seamen.* We think the view of the Third Circuit (see *Yates v. Dann,* 223 F.2d 64, 67) is preferable to that of the Second Circuit as expressed in *Wilson v. United States,* [229 F.2d 277] and *Perez v. Suwanee S.S. Co.,* [239 F.2d 180], *supra,* and to that of the Fourth Circuit in this case.

*Id.* at 532, 82 S.Ct. at 1000 (emphasis added).

██ Since *Vaughan,* however, the federal courts have had a difficult time fashioning a consistent rule with respect to when a seaman's wages from other employment may be used to offset maintenance he or she is owed by a former employer.[14] Surprisingly, the Second Circuit has not addressed this issue since *Wilson* and *Perez,* both of which predate *Vaughan.* However, and despite the fact that a determination on this issue is extremely fact sensitive, as a general rule it at least can be said that the wages earned by

**13.** In *Johnson,* the Supreme Court affirmed the lower courts denial of maintenance and cure to a seaman who refused to enter various free government hospitals following an extended stay with the Public Health Service. Instead, the seaman *voluntarily* chose to recuperate on his parents ranch despite the recommendation of doctors from the Public Health Service. As there was "ample evidence to support the findings of the two lower courts that [the seaman] incurred no expense or liability for his care and support at the home of his parents" maintenance and cure was denied. *Johnson v. United States,* 333 U.S. 46, 50, 68 S.Ct. 391, 393, 92 L.Ed. 468 (1948).

**14.** *Compare Dowdle v. Offshore Express, Inc.,* 809 F.2d 259, 265 (5th Cir.1987) (offset of maintenance allowed where seaman was marked fit for duty and *voluntarily* returned to his *accustomed* trade as a seaman despite the presence of symp-

toms from the claimed injury) *and Pyles v. American Trading & Production Corp.,* 372 F.2d 611, 619 (5th Cir.1967) (maintenance and cure may be offset by wages earned by seaman "*voluntarily* working at his *accustomed* trade rather than using maintenance and cure to speed his recovery") (emphasis added) *with Wood v. Diamond M Drilling Co.,* 691 F.2d 1165, 1170–71 (5th Cir. 1982) (offset not allowed where seaman obtained nonmaritime employment for unspecified reasons during convalescence), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983) *and Capone v. Boat St. Victoria,* Civ.A. No. 85–1565–MC, 1989 WL 47387, *18 (D.Mass. Apr. 27, 1989) (no offset where seaman returned to work as a seaman but in a different capacity than his previous position, and it was unclear whether he returned to work voluntarily or due to economic necessity).

a seaman who *involuntarily* returns to work in an *unaccustomed* trade after the shipowner refuses to pay maintenance and cure cannot be used to offset any maintenance subsequently determined to have been owed by the shipowner. *See, e.g., Vaughan, supra; Wood v. Diamond M Drilling Co.,* 691 F.2d 1165, 1170–71 (5th Cir.1982); *Pyles v. American Trading & Production Corp.,* 372 F.2d 611, 619 (5th Cir.1967); *Domeracki v. Gulf Oil Corp.,* 342 F.2d 219, 220 (3d Cir.1965); *Capone v. Boat St. Victoria,* Civ. A. No. 85–1565–MC, 1989 WL 47387, \* 8–18 (D.Mass. Apr. 27, 1989).[15]

■ The same reasoning employed in *Vaughan* and the cases cited above can be applied with equal force to the question of whether a shipowner should be able to decrease its liability for maintenance when, acting callously or not, it denies such a claim and, thereby, forces an injured seaman to reside with, and be cared for by, family and/or friends. As the purpose of maintenance and cure is quasi-contractual and remedial in nature—it arises out of the unique relationship between a shipowner and seaman, see, e.g., *Cortes v. Baltimore Insular Line,* 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932), and is intended to protect injured seaman and provide an incentive for shipowners to look after the seaman's health and welfare and make the injured seaman as whole as possible following an injury or illness suffered while in the shipowner's employ, see, e.g., *Aguilar, supra,* 318 U.S. at 728, 63 S.Ct. at 932—it stands to reason that a shipowner cannot escape its liability for

maintenance by forcing an injured seaman to involuntarily seek the financial support of family and friends during his or her convalescence. Allowing shipowners to do so would be at odds with the purpose behind maintenance and cure as it would provide a disincentive for shipowners to pay maintenance, would not make the seaman as whole as possible, and, moreover, in many cases would make the seaman and his benefactors less well off than before the injury or illness. *See, e.g., id.; Vaughan, supra,* 369 U.S. at 532, 82 S.Ct. at 1000.

■ There seems to be little question that prior to his injury at the age of thirty-four, McMillan was living apart from his family (Tr. 224–25, 249–51). McMillan testified that at the time of his injury he had no apartment, but until eighteen days before the accident he had been sharing one with a friend (Tr. 249–51). After his injury, he moved in with his girlfriend and thereafter with other friends (Tr. 249–51). During this period McMillan also rented an apartment although he was receiving no income, but was evicted after only one month (Tr. 250). Eventually McMillan moved in with his brother's family in Correy, Pennsylvania (Tr. 251). Based on this evidence, it is clear that after his injury McMillan was not voluntarily living with his friends and family. Accordingly, McMillan is entitled to maintenance in the amount of $40 per day—the maintenance he would have been due had he not been forced to reside with friends and family because of Bouchard's termination and refusal to reinstate his maintenance. Neither

**15.** Although Bouchard does not argue that any maintenance it may owe to McMillan should be offset by the wages he earned from other employment during his convalescence, for completeness, the issue should be addressed briefly. At trial, McMillan testified that during the period when Bouchard refused to reinstate his maintenance and cure he worked as a carpenter for Florida Builders for two weeks, and thereafter for an unnamed firm in Correy, Pennsylvania from July 1993 through November 1993. It is uncontradicted, however, that McMillan returned to work involuntarily as he had no means of supporting himself. Further, McMillan did not return to his "accustomed trade" as a seaman/deckhand, but rather to work that he had performed many years in the past. Even though this employment may be relevant in determining when he reached maximum medical cure, see

*Permanente Steamship Corp. v. Martinez,* 369 F.2d 297, 299 (9th Cir.1966), under the reasoning of any of the above-mentioned cases, the wages he earned during this period cannot be used to offset any maintenance owed to him by Bouchard. *See, e.g., Vaughan, supra; Wood, supra; Pyles, supra; Domeracki v. Gulf Oil Corp.,* 342 F.2d 219, 220 (3d Cir.1965); *Capone, supra. See also Gauthier v. Crosby Marine Service, Inc.,* 752 F.2d 1085, 1089–90 (5th Cir.1985) (shipowner not entitled to offset maintenance by monies received on an insurance policy paid for exclusively by the seaman); *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 536 (9th Cir.1962) (no offset for disability payments received under California Compensation Disability Act); *Kirk v. Allegheny Towing Incorporated,* 620 F.Supp. 458, 462–63 (W.D.Penn.1985) (no offset for workers' compensation benefits).

McMillan, nor his friends and family, should be forced to make good on Bouchard's obligation to provide an appropriate amount of maintenance during his convalescence.

## Punitive Damages—Callous & Recalcitrant Conduct

■ McMillan claims that Bouchard "wilfully, wantonly and callously refused to pay [his] maintenance and cure." Therefore, McMillan asserts that he is entitled to punitive damages in the amount of $400,000 in addition to his reasonable attorneys' fees.[16] In so doing, McMillan's counsel advocates adopting a rule of law that explicitly has been rejected by the Second Circuit. *See Kraljic v. Berman Enterprises, Inc.*, 575 F.2d 412, 415–16 (2d Cir.1978) (*applying Vaughan, supra*).[17] It is the rule of law in this Circuit that punitive damages in maintenance and cure cases are limited to the seaman's reasonable attorneys' fees. *Id.* Accordingly, McMillan's claim for punitive damages in excess of his reasonable attorneys' fees is denied. *See, e.g., Petsas v. Spentonbush Transp. Serv., Inc.*, No. 89 CIV. 1424, 1993 WL 190326, at *1 (S.D.N.Y. June 3, 1993).

■ In order for Bouchard to be liable for McMillan's attorneys' fees, it must have acted "callously" or "recalcitrantly" in terminating and refusing to reinstate McMillan's maintenance and cure. *See Incandela, supra,* 659 F.2d at 15 (*citing Roberts v. S.S. Argentina,* 359 F.2d 430 (2d Cir.1966)). Ordinarily the issue of callousness or recalcitrance is one for a jury. *Id.* However, in pure maintenance and cure cases, where there is no jury, the issue must be addressed by the court.[18] While there is no hard and fast rule on what constitutes callous or recalcitrant conduct on the part of a shipowner in denying a claim for maintenance and cure, the courts of this Circuit focus on the shipowner's good faith in investigating the seaman's claim for maintenance and cure. *Rodriguez Alvarez, supra,* 898 F.2d at 316 ("When a ship operator fails to make a prompt, good faith investigation of a seaman's claim for maintenance and cure or otherwise takes a 'callous' or 'recalcitrant' view of its obligations, the seaman may recover legal expenses on top of maintenance and cure"); *Roberts, supra,* 359 F.2d at 431; *Roberts v. City of New York,* No. 85 CIV. 4066, 1987 WL 14469, *4 (S.D.N.Y. July 10, 1987).[19]

16. In his opening statement, McMillan's counsel stated that he would show that McMillan suffered psychological damages as a result of Bouchard's alleged willful conduct in terminating and refusing to reinstate maintenance and cure (Tr. 8–9). At trial, McMillan testified that as a result of the termination and refusal to reinstate his maintenance and cure he was forced to apply for "food stamps and welfare assistance" in order to survive (Tr. 219). He testified further that as he had never had to do this before in his life it made him feel "very degraded" (Tr. 219). Even if true and recoverable, in light of the finding, *infra,* on the ultimate issue of whether Bouchard's conduct was callous or recalcitrant, McMillan is not entitled to consequential damages.

17. McMillan's counsel urges that the Second Circuit's rule in *Kraljic v. Berman Enterprises, Inc., 575 F.2d 412, 415–16 (2d Cir.1978),* which forbade punitive damages in excess of reasonable attorneys' fees should not be followed in this case. Counsel raises two arguments in support of this position: one, that the "duty to provide maintenance and cure should be scrupulously protected and the awarding of punitive damages is the best way to do so, especially in view of defendants' extensive history of failing to pay maintenance and cure to its seamen necessitating that lawsuits be commenced"; and two, that

*Kraljic* failed properly to analyze the Supreme Court decision in *Vaughan, supra,* and has been called into question by at least one scholarly article. *See* Pl.'s Trial Mem. at 16. As *Kraljic* cannot fairly be distinguished, these arguments will have to be addressed to the Court of Appeals.

18. Several district courts have not followed this precept strictly. *See Dixon v. Maritime Overseas Corp.,* 490 F.Supp. 1191, 1193 (S.D.N.Y.1980); *Hollingsworth v. Maritime Overseas Corp.,* 363 F.Supp. 1393, 1394 & n. 1 (E.D.Pa.1973); *Reed v. People-to-People Health Foundation, Inc.,* 336 F.Supp. 18, 19 (E.D.Pa.1972). In none of these cases, however, was the issue of the jury's role in determining the employer's conduct for the purposes of awarding counsel fees directly addressed.

19. In *Rodriguez Alvarez,* the Second Circuit found a shipowner's conduct to be callous and recalcitrant where, upon being notified of a seaman's claim for maintenance and cure, the shipowner immediately referred the claim to its attorneys. Despite having been aware of the seaman's serious need for treatment, the shipowner's attorneys persisted in "stonewalling" the claim for over six months. Counsel also demanded that the seaman make himself available

From the evidence at trial, it is clear that Bouchard conducted a good faith investigation into McMillan's original claim for, and subsequent requests to reinstate, maintenance and cure. Following McMillan's injury, Bouchard located a neurosurgeon in Florida, where McMillan resided, and arranged for an examination (Tr. 51). Based on Dr. Lora's initial report Bouchard began paying McMillan's maintenance and cure (Tr. 55). Bouchard also paid for McMillan to have an MRI, and physical therapy, both of which were recommended by Dr. Lora (Tr. 56). It was only after having received the results of the MRI, Dr. Lora's report following a second examination, and discussing the issue with him, that Bouchard terminated McMillan's maintenance and cure (Tr. 58–60). Maintenance and cure was terminated based on the results of the MRI and Dr. Lora's opinion that McMillan had reached maximum medical cure (Tr. 60–62).

McMillan notes that although Dr. Lora's second report states that he had reached maximum medical cure, the report also contains a finding that he could "return to work as soon as Dr. Gilman or any other orthopedist decides for him to" (Tr. 58). This, McMillan argues, indicated that he actually had not reached maximum medical cure, and required that Bouchard send him to an orthopedic surgeon to determine if he had in fact reached that level of improvement. McMillan argues further that Bouchard's failure to send him to an orthopedic surgeon, or to continue payments for maintenance and cure, was callous and recalcitrant. These arguments are unpersuasive.

■ The issues of whether a seaman has reached maximum medical cure, and whether he or she is fit for duty are separate and distinct. A seaman may have reached maximum medical cure, but still not be fit for duty, or vice versa. *See, e.g., Koslusky v. United States,* 208 F.2d 957, 959 (2d Cir. 1953); *Diniero v. United States,* 185 F.Supp. 818, 820 (S.D.N.Y.1960). Dr. Lora's suggestion that McMillan see an orthopedist was to determine whether he was fit for duty, not whether he had reached maximum medical cure. *See* Lora Dep. at 35. Second, Dr. Lora's opinion that McMillan had reached maximum medical cure was based on a physical examination and the results of the MRI. The recommendation to send McMillan to an orthopedic surgeon was based on his complaints of coccyx pain, which Dr. Lora felt was because of a prior back injury which McMillan had mentioned during the first examination (Tr. 111). *See also* Lora Dep. at 35. Dr. Lora felt that this back pain was unrelated to the injury suffered on the tug, and the pain mentioned during the first examination (Tr. 65–68). Accordingly, as Dr. Lora opined that McMillan had reached maximum medical cure and that his continued complaints were because of a prior unrelated injury, Bouchard could believe in good faith that it had no duty to pay for McMillan to see an orthopedic surgeon or continue payments for maintenance and cure, and I so find.

In addition to having terminated McMillan's maintenance and cure, Bouchard refused to reinstate such payments following McMillan's repeated requests through counsel. McMillan claims that this conduct was callous and recalcitrant as Bouchard was put on notice that he was in need of additional medical care. McMillan also argues that as Austen had no medical training and did not call the various health care providers which prepared the medical reports, Bouchard did not properly reinvestigate his claim for maintenance and cure (Tr. 72–82). Further, as stated earlier, McMillan argues that his failure to disclose his prior injuries and Valium use was made in good faith, and in any event was not relevant to his employment with Bouchard, this failure could not be used as a good faith basis to refuse to reinstate his maintenance and cure. Based on the evidence and the law, these arguments cannot be sustained.

■ When a seaman reasserts a claim for maintenance and cure after such payments

for a medical examination in New York City while the seaman had returned to his home in Honduras. Further, the shipowner made no effort to locate a Honduran physician who could

have performed the examination the shipowner deemed necessary. *Rodriguez Alvarez, supra,* 898 F.2d at 317. The facts at bar are clearly distinguishable from *Rodriguez Alvarez.*

have already been terminated, it becomes the employer's obligation to reinstate such payments. *See Johnson v. Marlin Drilling Co.,* 893 F.2d 77, 79 (5th Cir.1990); *Brown v. OMI Corp.,* Nos. 92 CIV. 5371, 74112, 1994 WL 714445, at *2 (S.D.N.Y. Dec. 21, 1994). If the employer refuses to reinstate maintenance and cure, it bears the burden of establishing that it had a legitimate reason for so refusing. *Sammon, supra,* 442 F.2d at 1029. Consequently, the employer must undertake at least a minimal reinvestigation into the facts of the case, and determine whether the payments should be reinstated. *See Brown, supra,* 1994 WL 714445, at *2. However, in such a situation, "there is no authority for the proposition that the employer must seek a medical, as opposed to factual, basis upon which the claim for maintenance and cure can be denied in good faith." *Id.*

Here, there is no indication that Bouchard did not conduct at least a minimal investigation into McMillan's request to reinstate his maintenance and cure. When initially contacted by McMillan concerning the possible reimbursement of his chiropractic treatments, Austen offered him the opportunity to submit Dr. Pitts' reports and bills and said "he would try and take care of them" (Tr. 215). McMillan submitted the reports and they were reviewed (Tr. 71). In addition, even after McMillan was represented by counsel, Bouchard reviewed all reports submitted by counsel, including those of Dr. Jones (Tr. 66–90). It was during the period of time in which McMillan requested that his maintenance and cure be reinstated that Austen became aware of McMillan's prior back injuries and Valium use (Tr. 111). Even though the new medical reports submitted by McMillan and his counsel stated that McMillan was not fit for duty and in need of continued treatment, Bouchard chose not to reinstate McMillan's maintenance and cure.

The decision not to reinstate McMillan's maintenance and cure was based in part on the newly discovered factual evidence—the prior back injuries and Valium use—as well as on Dr. Lora's original opinion that McMillan had reached maximum medical cure on May 18, 1992 (Tr. 111–13). According to Austen, many of the newly submitted reports were based on subjective findings and were inconsistent with the prior objective neurological and radiological findings. Further, a finding that the decision not to reinstate maintenance and cure was made in good faith follows from Bouchard's knowledge of McMillan's statement that "one way or another I am getting off the boat"—a statement which raised the possibility that McMillan's claim for maintenance and cure was fraudulent even before the injury occurred. McMillan claims that Bouchard's basis for refusing to reinstate maintenance and cure—the nondisclosure of his Valium use and prior back injuries—was "a sham" and "a defense concocted for this litigation." Pl.'s Post-trial Mem. at 5–6. What this argument ignores is the fact that Bouchard had a legitimate and good faith basis to deny McMillan's request to reinstate maintenance and cure as early as May 18, 1992—Dr. Lora's original opinion that McMillan had reached maximum medical cure. *See Sammon, supra,* 442 F.2d at 1029. Given this fact, and also that Dr. Lora's May 18, 1992 opinion on maximum medical cure did not change until his deposition, which occurred some 29 months later, there is no indication of bad faith by Bouchard in denying McMillan's continued requests to reinstate his maintenance and cure.

From the evidence presented at trial, and the circumstances surrounding the case, it is clear that Bouchard made a sufficient investigation into McMillan's original claim for maintenance and cure and his subsequent requests to reinstate such payments. Whether based on Dr. Lora's opinion that McMillan had reached maximum medical cure—even if that opinion ultimately proved incorrect—or the possibility that (1) his continued complaints were due to an undisclosed prior back injury, (2) McMillan's undisclosed Valium use, or (3) McMillan may have concocted the injury as a pretext for "getting off the boat", Bouchard could reasonably have believed that it had no obligation to continue maintenance and cure, or reinstate such payments upon McMillan's requests. A shipowner acting in good faith need not seek a medical, as opposed to factual, basis upon which a claim for maintenance and cure may be denied. *See Brown v. OMI Corp.,* No. 92

CIV. 5371, 1994 WL 39026, at *3 (S.D.N.Y. Feb. 9, 1994). Even though I find that its decision to deny maintenance and cure was erroneous, under all the circumstances that decision had a good faith basis and certainly Bouchard's conduct was not callous or recalcitrant. Accordingly, McMillan's claim for punitive damages is denied.

### Conclusion

Based on the foregoing, McMillan is entitled to maintenance in the amount of $40 per day from May 19, 1992, through November 17, 1993. In addition, McMillan is entitled to the actual medical expenses he incurred during that period. Further, McMillan's claim for punitive damages and attorneys' fees is denied as Bouchard's termination of, and refusal to reinstate, his maintenance and cure was neither callous nor recalcitrant.

The parties are hereby ordered to submit proposed judgments upon proper notice to the opposition within thirty days of receipt of this memorandum and order.

SO ORDERED: